**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LENDINGCLUB BANK,** **NATIONAL ASSOCIATION,** )<br>)<br>)<br>)<br>**Plaintiff,** )<br>)<br>)<br>**v.** )<br>)<br>**VALLEY NATIONAL BANK,** )<br>)<br>**Defendant.** )<br>) | **Civil Action No.** **25-10630-FDS** |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTIONS TO DISMISS OR,**
<u>**IN THE ALTERNATIVE, TO TRANSFER VENUE**</u>

**SAYLOR, J.**

This is an action arising out of a dispute between participants in a commercial real-estate investment. Plaintiff LendingClub Bank, N.A., alleges that defendant Valley National Bank delayed, misrepresented, or omitted material information in communications concerning a loan participation agreement through which LendingClub purchased a 20% interest in a commercial real-estate loan. The amended complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and unfair trade practices in violation of Mass. Gen. Laws ch. 93A. Valley has moved to dismiss the amended complaint for lack of personal jurisdiction or, in the alternative, to transfer venue to the District of New Jersey, and to dismiss the complaint for failure to state a claim.

For the following reasons, the motion to dismiss for lack of personal jurisdiction will be denied; the motion to transfer will be denied; and the motion to dismiss for failure to state a claim will be granted in part and denied in part.

I.    **Background**

Unless otherwise noted, the following facts are set forth as alleged in the amended complaint.[1]

A.    **Factual Background**

LendingClub Bank, N.A. is a national banking association with its main office located in Lehi, Utah. (Am. Compl. ¶ 1, Dkt. No. 33). LendingClub is a citizen of Utah. (*Id.*).[2] On February 1, 2021, LendingClub acquired Radius Bancorp and its subsidiary Radius Bank ("Radius"). (*Id.*). Radius, now renamed LendingClub, has been located in Boston, Massachusetts, at all relevant times. (*Id.*).

Valley National Bank is a national banking association with its main office located in Morristown, New Jersey. (*Id.* ¶ 2). Valley is a citizen of New Jersey. (*Id.*). Valley is wholly owned and controlled by Valley National Bancorp, which has a principal place of business in New York, New York. (*Id.*).

In late 2019 or early 2020, Valley solicited an opportunity to purchase a partial interest in a commercial real-estate loan. (*Id.* ¶ 11). On February 6, 2020, a Radius employee expressed interest in the bank participating in the loan. As a result, William Seery, Valley's First Vice President of Loan Syndications, contacted Brad Wolcott and Brendan O'Leary at Radius to discuss the opportunity. (*Id.* ¶ 12). On February 10, 2020, Seery pitched the opportunity to enter into a participation agreement to Wolcott and O'Leary over the telephone and through e-mail.

---

[1] On a motion to dismiss, the court may properly consider four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

[2] A national bank is considered a citizen only of the state in which its main office is located for diversity-jurisdiction purposes. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006).

(*Id*. ¶ 14).  At all relevant times, Seery was located at Valley's New York office and Wolcott and O'Leary were in Boston.  (*Id*. ¶ 12).

On April 8, 2020, Valley loaned $49,300,000 to 1100 American Blvd LLC (the "borrower").  (*Id*. ¶ 21).  The borrower was the leasehold owner of 1100 American Boulevard in Pennington, New Jersey.  (*Id*. ¶ 24).  The borrower was a single-purpose entity controlled by Shulamit Prager, who was also a guarantor on the loan.  (*Id.* ¶¶ 22, 24).  Prager is a real-estate investor who is also a principal of Opal Holdings LLC, a real-estate firm based in New York.  (*Id.* ¶ 22).  The sole tenant of 1100 American Boulevard was Merrill Lynch, whose lease was scheduled to expire on November 30, 2024.  (*Id.* ¶¶ 24, 26).

On April 14, 2020, Radius entered into a contract (the "Participation Agreement") with Valley to purchase 20.28398 percent of the loan for $10,000,002.10.  (*Id.* ¶ 3).

Between February 2020 and August 2024, Valley sent hundreds of communications to Radius (and later LendingClub) employees in Massachusetts, providing updates on payments, servicing, and the status of the loan.  (*Id.* ¶¶ 16, 19).[3]  During that same period, Valley solicited LendingClub employees in Massachusetts to participate in at least six other refinancing and loan opportunities.  (*Id.* ¶ 17).  Valley also sent monthly payments due under the Participation Agreement to LendingClub's Boston office.  (*Id.* ¶ 18).  As recently as April 2025, Valley sent multiple requests for payment to LendingClub in Boston for fees and costs arising out of the Participation Agreement.  (*Id.*).  In addition, Seery visited Wolcott and O'Leary at LendingClub's Boston office at least once.  (*Id.* ¶ 20).

---

[3] After acquiring Radius, LendingClub became the successor-in-interest to all of the rights and interests of Radius under the contract.  (Am. Compl. ¶ 4).

As noted, the Merrill Lynch lease was scheduled to expire on November 30, 2024.  A lease renewal was critical to the borrower's ability to perform under the loan.  Accordingly, as the lease's expiration date neared, much of the communication between LendingClub and Valley dealt with a potential lease extension.  (*See id*. ¶¶ 26-35).

On October 25, 2023, O'Leary requested information concerning the status of the lease extension by e-mail.  (*Id*. ¶ 26).  Seery responded to that e-mail that day, but did not provide an update on the lease extension.  (*Id*. ¶ 27).  That same day, O'Leary asked again for an update on the status of the lease extension.  (*Id*. ¶ 28).  Seery replied the next day stating that the extension option notice was "expected any day."  Ann Wilhelm, a fellow Valley employee in the New York office, also replied stating that the "[b]orrower has not received the notice yet but is expecting any day."  (*Id*. ¶ 29).

O'Leary followed up with Valley concerning the lease extension on December 8, 2023, and January 16, 2024.  (*Id*. ¶ 30).  Wilhelm replied on January 16, explaining that she was meeting with the borrower the following Wednesday and that the extension would be discussed. (*Id*.).  By March 5, 2024, O'Leary had received no update on that meeting, so he again contacted Valley.  (*Id*. ¶ 31).  The following day, Wilhelm replied indicating that Prager had not received a notice of extension from Merrill Lynch and that she would let him know when Valley knew more.  (*Id*. ¶ 32).

On March 18, 2024, Brian Cirone, LendingClub's senior manager of commercial credit, e-mailed Wilhelm concerning a late loan payment from the borrower that was due on March 1, asking if the payment had been received.  (*Id*. ¶ 33).  Cirone also asked for the latest update on the lease extension.  (*Id*.).  Wilhelm replied on March 26, 2024, explaining that she had "spoke[n] with [b]orrower's CFO again today. Hopefully we will have this resolved prior to

quarter end[,]" and that she would let LendingClub know once Valley received payment from the borrower. (*Id*. ¶ 34). Wilhelm also responded to the lease extension inquiry, stating that "there have been preliminary conversations with Merr[i]ll Lynch for a short-term extension," but that she did "not have any specifics yet on what short-term means." (*Id*.).

Over the next several months, LendingClub representatives continued to ask Valley for more information concerning Merrill Lynch's lease extension. At some point, Valley informed them that Merrill Lynch had not extended the lease. (*Id*. ¶ 35). It appears that there was no prospective new tenant; with no rental income, the borrower would be left with no means to repay the loan. (*Id*.).

On March 27, 2024, Wilhelm e-mailed Cirone about the missed loan payment and advised that LendingClub would receive the payment the following day. (*Id*. ¶ 40). Wilhelm also proposed a plan to sweep rent payments into a Valley account. (*Id*.). Cirone approved the plan to sweep payments into a Valley account on March 28, 2024. (*Id*. ¶ 41).

On April 9, 2024, Valley sent the borrower a notice stating that a "cash management trigger event" had occurred pursuant to the loan documents. The notice required the borrower to create a cash-management account with Valley, to deposit all operating tenant income into that account, and to direct Merrill Lynch to pay its rent directly into the account. (*Id*. ¶ 44). Valley also told the borrower that "[f]ailure to timely comply with the provisions of this [n]otice and [d]emand shall constitute an [e]vent of [d]efault." (*Id*. ¶ 45). The borrower, however, never signed the cash-management agreement, nor did it send any notice to Merrill Lynch. (*Id*. ¶¶ 46-47).

Despite the borrower's failure to comply with the notice, Valley did not declare at that point that the borrower was in default. (*Id*. ¶¶ 47-48). Valley also allegedly did not pursue

further action to effectuate the cash-management agreement with the borrower, which LendingClub contends failed to protect the loan's collateral. (*Id*. ¶ 49). In addition, LendingClub alleges that Valley did not provide it with timely notice of the borrower's failure to comply with the cash-management notice. (*Id*. ¶ 50).

On April 4, 2024, Cirone e-mailed Wilhelm asking if Valley had received the borrower's April 1, 2024 payment and if Valley intended to issue a default letter. (*Id*. ¶ 52). Wilhelm replied stating that Valley had not received the payment and that she had called the borrower that day and the day prior. (*Id*.). She added that Valley could issue a notice of default but the "concern is the swap and if an [event of default] would terminate the swap." (*Id*.).[4]

The complaint alleges that, unbeknown to LendingClub at the time, Valley had entered into five other "very substantial loans with affiliates of the [b]orrower and Prager." (*Id*. ¶ 53). The complaint further alleges that, aside from limited disclosures of potential dealings with affiliates of the borrower and Prager, Valley did not disclose the full extent of their relationship. (*Id*.). The complaint alleges that Valley refused to put the borrower in default, thus violating the standard of care required in the Participation Agreement, because it wanted to avoid cross-defaulting other loans that it had with affiliates of the borrower and Prager. (*Id*. ¶ 55).

Also on April 4, 2024, due to the borrower's continued late loan payments, Cirone searched the borrower and Prager on the internet and discovered a news article stating that Prager's management company, Opal Holdings, had been named in various lawsuits. (*Id*. ¶ 60).

---

[4] The complaint does not include any additional allegations concerning what the term "swap" refers to here. An e-mail from William Seery to Brad Wolcott and Brendan O'Leary outlining the general terms of the loan suggests that it likely refers to an interest rate swap agreement. (Am. Compl., Ex. B). This is a common financial instrument in which "one party swaps some of its variable rate interest obligations for the other party's fixed rate interest obligations." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1046 (11th Cir. 1994).

He forwarded the e-mail to Wilhelm, but Valley again did not respond or take other action concerning the loan.  (*Id.*).

On May 8, 2024, Cirone e-mailed Wilhelm "with a series of material inquiries regarding the [b]orrower, the [l]oan and [Valley's] relationship with the [b]orrower, the [g]uarantor and their affiliates[,]" to which Wilhelm allegedly never responded.  (*Id.* ¶ 62).

During a call on June 26, 2024, Angela Morisco, a Valley employee, stated that Valley was going to send a notice of default to the borrower for failure to provide financial statements and failure to use Valley as its principal bank.  (*Id.* ¶ 63).  That call was the first time that Valley disclosed to LendingClub that the borrower had failed to provide financial statements as required under the loan documents.  (*Id.* ¶ 64).  It did not disclose for how long the borrower had been in default for failure to provide such statements.  (*Id.*).  The complaint alleges that this was another example of Valley failing to provide it notice of a clear and unambiguous event of default.  (*Id.*). In addition, during that call, she told LendingClub that it continued to request that the borrower cooperate in its cash-management notice from April, but that Valley was still unwilling to put the loan in payment default.  (*Id.* ¶ 66).  During the same call, Valley failed to disclose that the borrower had previously transferred $645,870 from its Valley bank accounts to accounts at another bank.  (*Id.* ¶ 65).

Later that day, Valley sent LendingClub a copy of the default notice it sent to the borrower.  (*Id.* ¶ 67).  That notice was the first time LendingClub learned of the borrower's $645,870 transfer.  (*Id.*).

On a July 29, 2024 status call, Morisco told Cirone that the loan was current, but that Valley had begun charging the default interest rate from the initial default.  (*Id.* ¶ 73).  In addition, Morisco stated that Valley had "asked for proof of ownership of land lease" and that

Valley was becoming aware of the possibility that the landlord on the ground lease, AREP Hopewell LLC, and the borrower shared common ownership. (*Id*.). That call was allegedly the first time that LendingClub learned of any potential common ownership of the property. (*Id*. ¶ 75). Valley allegedly did not disclose when or how it learned of the potential common ownership, nor did it disclose why it did not disclose that information immediately when it learned that fact. (*Id*.).

On an August 21, 2024 call between Cirone and Morisco, Morisco reported that Valley had not received the loan payment due August 1, 2024. (*Id*. ¶ 76). During an August 29, 2024 call, Morisco asked Cirone if LendingClub supported taking legal action against the borrower and Prager individually, "including beginning foreclosure proceedings, breaking the swap and taking action on the guarantee." (*Id*. ¶ 77). Cirone consented to that action on behalf of LendingClub. (*Id*.). During that same call, Morisco reported that Valley had still not received the August 1 payment from the borrower, that the borrower had "gone dark," and that there were not enough funds in the borrower's accounts to cover the payment. (*Id*. ¶ 78). Despite the borrower allegedly going "dark," however, Valley did not believe a payment default had occurred. (*Id*.). Instead, it allegedly claimed that "just financial covenant defaults" had occurred. (*Id*.).

On September 4, 2024, Morisco told LendingClub that the swap was broken and that the proceeds were settled that day.[5] However, she advised that Valley was still not willing to put the loan into non-accrual and intended to apply the swap proceeds against payments as they came

---

[5] This apparently refers to the early termination of an interest rate swap agreement. When an interest rate swap is terminated early, one party will typically owe the other a termination fee based on the market value of the swap at the time it is terminated. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *47 (S.D.N.Y. Aug. 4, 2015). Presumably, the "proceeds" referred to in the complaint were the termination fee the borrower owed under the swap agreement.

due. (*Id*. ¶ 79). Valley reported that the swap funds were received on September 9, 2024, but that Valley intended to hold onto them "for the time being." (*Id*. ¶ 80). On September 27, 2024, Morisco told LendingClub that Valley would be applying the swap proceeds to the August, September, and October payments "to delay going non-accrual" on the loan. (*Id*. ¶ 81).

According to the complaint, that call—on September 27, 2024—was also the first time that Valley revealed it had five other loans with Prager. (*Id*.).

On November 5, 2024, Morisco e-mailed Cirone a copy of a lawsuit filed against AREP. (*Id*. ¶ 84). On a call that same day, Morisco stated that Valley was just then able to confirm common ownership of AREP and the borrower—a statement that LendingClub asserts was false. (*Id*. ¶ 85).

On November 6, 2024, and without providing LendingClub prior written notice, Valley filed a complaint against the borrower and Prager in the Superior Court of New Jersey. (*Id*. ¶ 91). On November 20, 2024, Valley also filed a lawsuit against Wood Ave 196 LLC (an affiliate of the borrower), Shulamit Prager, and Avrahom Prager alleging a loan default. (*Id*. ¶ 94). The complaint alleges that Valley never disclosed that lawsuit to LendingClub. (*Id*.). A notice of default for Wood Ave 196 LLC dated May 20, 2024 was attached to that complaint. (*Id*. ¶ 95).

According to the complaint, while the Participation Agreement required Valley to notify LendingClub in writing of a default in the borrower's performance under the loan within a reasonable time, Valley continually failed to provide written notices. (*Id*. ¶¶ 98-100). On December 5, 2024, LendingClub sent a demand letter to Valley demanding that it cure its defaults and repurchase LendingClub's share of the loan; Valley did not substantively respond to that letter. (*Id*. ¶¶ 101-02).

### B.    Procedural Background

On March 18, 2025, LendingClub filed this action in the District of Massachusetts. Valley moved to dismiss for lack of personal jurisdiction and for failure to state a claim, and then filed a motion to transfer venue to the District of New Jersey.  In response to the motion to dismiss, LendingClub filed an amended complaint.  Valley filed a new motion to dismiss the amended complaint for lack of personal jurisdiction and for failure to state a claim.

## II.    Rule 12(b)(2) Motion to Dismiss

Defendant has moved under Rule 12(b)(2) to dismiss the complaint for lack of personal jurisdiction.  For the reasons that follow, this motion will be denied.

### A.    Legal Standard

The exercise of personal jurisdiction over a defendant must be authorized by statute and comport with the due-process requirements of the U.S. Constitution.  *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016) (citing *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002)).  Consistent with those requirements, a court may exercise either general or specific jurisdiction.  *See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 35 (1st Cir. 2016).

> Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities.  General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.
>
> *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (citations and

quotations omitted).

The plaintiff bears the burden of establishing that the court has personal jurisdiction over a defendant.  *See Daynard*, 290 F.3d at 50.  Where, as here, the court considers a motion to

10

dismiss under Fed. R. Civ. P. 12(b)(2) without first holding an evidentiary hearing, the *prima facie* standard applies. *See Swiss Am. Bank, Ltd.*, 274 F.3d at 618.

Under that standard, the court takes the plaintiff's "properly documented evidentiary proffers as true and construe[s] them in the light most favorable to [the plaintiff's] jurisdictional claim." *A Corp.*, 812 F.3d at 58. The plaintiff may not "rely on unsupported allegations in its pleadings." *Id.* (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006)) (alteration omitted). Instead, the plaintiff "must put forward 'evidence of specific facts' to demonstrate that jurisdiction exists." *Id.* (quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995)). In other words, plaintiffs cannot "rely solely on conclusory averments but must adduce evidence of specific facts." *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020). Facts offered by the defendant "become part of the mix only to the extent that they are uncontradicted." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007)).

### B.    Analysis

This court may exercise personal jurisdiction over defendant only if that exercise comports with both Massachusetts statutory law and the limitations imposed by the Due Process Clause of the Fourteenth Amendment. The Court will address each in turn.

### 1.    Massachusetts Long-Arm Statute

The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, "'imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process' and thus . . . courts are to begin with 'a determination under the long-arm statute' before 'considering the constitutional question.'" *Mojtabai v. Mojtabai*, 4 F.4th 77, 85 (1st Cir. 2021) (quoting *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 326 (2017)) (citation modified).

11

"The requirements of [the long-arm statute] may not be circumvented by restricting the jurisdictional inquiry to due process considerations." *SCVNGR*, 478 Mass. at 329-30.

The Massachusetts long-arm statute authorizes personal jurisdiction in eight specified circumstances. *See* Mass. Gen. Laws ch. 223A, § 3. As relevant here, the statute provides that the court "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth." *Id.* § 3(a).

For jurisdiction to exist under § 3(a), the complaint must allege sufficient facts to satisfy two elements: (1) the "defendant must have transacted business in Massachusetts," and (2) "the plaintiff's claim must have arisen from the transaction of business by the defendant." *Baskin-Robbins*, 825 F.3d at 34 n.3 (quoting *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994)). The requirement that a defendant has "transacted business" is construed "in a generous manner," and the inquiry focuses on whether it "attempted to participate in the Commonwealth's economic life." *United Elec., Radio, and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992).

Here, the complaint asserts that defendant entered into a business transaction with a party that was based in the Commonwealth. Defendant does not appear to dispute that the requirements of the long-arm statute are satisfied, as all of defendant's briefing addresses issues of constitutional due process. Therefore, because the statute appears to be satisfied, and defendant makes no argument otherwise, the Court finds that the requirements of § 3(a) of the long-arm statute have been satisfied.

### 2.    Constitutional Due Process

Plaintiff does not argue for the exercise of general jurisdiction over defendant, and accordingly the Court will only address the existence of specific jurisdiction.  A court may exercise specific personal jurisdiction consistent with the Due Process Clause only where a defendant has maintained "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

The minimum-contacts analysis has three elements—relatedness, purposeful availment, and reasonableness.

> First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum.  Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state. Third, the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.

*Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 95 (1st Cir. 2024) (internal quotations and citations omitted).

### a.    Relatedness

Plaintiff's claims arise out of defendant's activities in Massachusetts.  When determining whether a claim arises out of forum activity, "[a] consideration in a contract action . . . is whether the defendant's forum-based activity was instrumental in the contract's formation or breach."  *Bluetarp Fin., Inc. v. Matrix Const. Co., Inc.*, 709 F.3d 72, 80 (1st Cir. 2013). "Inferences can be drawn from the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (internal quotation marks and citation omitted).

This action relates to defendant's contacts with Massachusetts because those contacts were instrumental in both the formation and alleged breach of the Participation Agreement.  The

complaint alleges that defendant solicited and negotiated the Participation Agreement through communications with plaintiff's employees in Massachusetts.  (Am. Compl. ¶¶ 12-15).  Plaintiff has also provided an affidavit demonstrating that the Participation Agreement was executed by Wolcott from Radius's office in Boston, Massachusetts.  (Wolcott Aff. ¶ 11, Dkt. No. 47-2).

Furthermore, the core of plaintiff's claims is that defendant made false or misleading communications directed into Massachusetts and that it failed to make certain communications directed into Massachusetts that it should have, thereby breaching the contract between the parties.  (*See generally* Am. Compl. ¶ 5).  Because those communications (and omissions) are at the very heart of plaintiff's claims, the claims relate to defendant's activities in Massachusetts. *See Lawrence v. Next Ins., Inc.*, 774 F. Supp. 3d 237, 252 (D. Mass. 2025) ("[C]ommunications directed into Massachusetts may be considered contacts in the forum for relatedness purposes.").

### b.      Purposeful Availment

Defendant also purposefully availed itself of the privilege of conducting business in Massachusetts.  The purposeful-availment inquiry considers "the voluntariness of the contacts and the foreseeability of being haled into court based on those contacts." *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 124 (1st Cir. 2022).  "[V]oluntariness demands that the defendant's contacts with the forum result proximately from its own actions.  Foreseeability demands that the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Id.* (internal citations and quotation marks omitted).  "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995).

"[S]imply entering into a contract with a company in the forum state does not automatically establish the requisite contacts." *Bluetarp Fin.*, 709 F.3d at 82.  Here, however,

there was substantially more.  Defendant's five-year business relationship with plaintiff in Massachusetts was voluntary, systematic, and extensive, and was initiated by defendant.  It solicited, negotiated, and entered a long-term contract with plaintiff knowing that it was located in Massachusetts.  Over the next five years, it made hundreds of communications directed into Massachusetts concerning the Participation Agreement and sent monthly payments to plaintiff in Massachusetts for years.  One of its employees, William Seery, visited plaintiff's Boston office at least once to help maintain the relationship between the parties.  (Am. Compl. ¶ 20).  And it further availed itself of the benefits of conducting business in Massachusetts when it solicited plaintiff's employees in Massachusetts to participate in additional refinancing and loan opportunities.  (*Id.* ¶ 17; *id.*, Ex. C).  Based on those extensive contacts with plaintiff's employees in Massachusetts, it was foreseeable that defendant could be haled into court in Massachusetts.  Therefore, the purposeful-availment prong of the constitutional test is satisfied.

### c.    Reasonableness

Finally, the exercise of personal jurisdiction over defendant would be reasonable.  Courts undertaking that analysis consider five "gestalt factors":

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Baskin-Robbins*, 825 F.3d at 40.

The first factor "is only meaningful where a party can demonstrate some kind of special or unusual burden."  *Hannon v. Beard*, 524 F.3d 275, 285 (1st Cir. 2008) (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)).  Here, defendant contends that it and certain non-party

15

witnesses will face a burden to appear in this court.[6]  Defendant, however, is a large regional bank with substantial means, and therefore its burden of appearing in Massachusetts is minimal. *See Baskin-Robbins*, 825 F.3d at 40 ("Where, as here, parties of substantial means are involved, cross-country travel ordinarily does not qualify as a special or unusual burden.").  The second factor also favors jurisdiction, because Massachusetts has an interest in "redressing harms committed against its companies by out-of-state companies," including breaches of contracts.  *Bluetarp Fin.*, 709 F.3d at 83.[7]  The third factor likewise favors jurisdiction, because "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience."  *Sawtelle*, 70 F.3d at 1395.  The fourth factor is likely neutral. Defendant asserts that the judicial system's interest in obtaining the most effective resolution of the controversy is best served elsewhere because Massachusetts has no connection to the action and that there are three pending actions against Valley in the District of New Jersey.  (Memo. L. Supp. Def.'s Mot. to Dismiss 11-12, Dkt. No. 41).  However, as discussed, Massachusetts has a substantial connection to this action and an interest in resolving it.  Finally, the fifth factor is not implicated here.  Thus, the "gestalt" factors confirm that the exercise of personal jurisdiction is reasonable here.

For the foregoing reasons, the court's exercise of personal jurisdiction over defendant comports with the requirements of both Mass. Gen. Laws ch. 223A, § 3 and the Due Process Clause of the Fourteenth Amendment.  The motion to dismiss for lack of personal jurisdiction will therefore be denied.

---

[6] The availability of non-party witnesses is addressed in the venue section below.

[7] Defendant contends that this dispute does not broadly affect Massachusetts's citizens because the Participation Agreement is governed by New York law.  Nonetheless, the state still has an interest in protecting individual businesses operating within its borders.  *See Bluetarp Fin.*, 709 F.3d at 83.

III.     **Motion to Transfer Venue**

Alternatively, defendant moves to transfer this case to the District of New Jersey pursuant to 28 U.S.C. § 1404.  For the reasons that follow, that motion will likewise be denied.

A.     **Legal Standard**

Section 1404 permits a district court to transfer a case from one proper venue to another "[f]or the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  "The decision to transfer a case under § 1404 lies within the discretion of the trial court."  *First State Ins. Co. v. XTRA Corp.*, 583 F. Supp. 3d 313, 318 (D. Mass. 2022) (citing *Astro-Med*, 591 F.3d at 12).

B.     **Analysis**

1.     **Whether the District of New Jersey is a Proper Venue**

Before proceeding to an "individualized, case-by-case consideration of convenience and fairness," the statute requires a court to determine whether this action could have properly been brought in the proposed transferee court.  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citation omitted).  Venue clearly would have been appropriate in the District of New Jersey.  Defendant's main office is in Morristown, New Jersey, which is within that district, and plaintiff does not contest that venue would have been appropriate there.  *See* 28 U.S.C. §§ 1391(b)(1), (c)(2).  Therefore, this action could have properly been brought in the District of New Jersey.

2.     **Whether the Balance of Convenience and Fairness Weighs in Favor of Transfer**

"The plaintiff's forum choice 'should rarely be disturbed'; thus, 'the moving defendant . . . must establish that the private and public interests weigh heavily on the side of trial in the foreign forum.'"  *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 424 (1st Cir.

1991) (citation modified).  "The defendant[] ha[s] the burden to establish that, on balance, the interests of justice and convenience weigh heavily in favor of transfer."  *Systemation, Inc. v. Engel Indus.*, 992 F. Supp. 58, 63 (D. Mass. 1997) (citations omitted).

Courts in this district ordinarily consider the following factors in determining whether to transfer a case under § 1404(a):  (1) the relative convenience of the parties, (2) the convenience of the witnesses and location of documents, (3) any connection between the forum and the issues, (4) the law to be applied, and (5) the state or public interests at stake.  *Blue Cross & Blue Shield of Mass., Inc. v. Regeneron Pharms., Inc.*, 633 F. Supp. 3d 385, 390 (D. Mass. 2022).

### a.      Relative Convenience of Parties

Transfer is inappropriate where it would "merely . . . shift the inconvenience from one party to the other."  *Sigros v. Walt Disney World Co.*, 129 F. Supp. 2d 56, 71 (D. Mass. 2001).  Here, Massachusetts is a more convenient forum for LendingClub because of its substantial presence in the state, while New Jersey would be more convenient for Valley because its main office is located there.  Ordinarily, "it is not a hardship to travel from New York to Boston in order to appear for a civil trial"; adding the short distance from Morristown to New York does not materially alter that calculus.  *See Blue Cross & Blue Shield of Mass.*, 633 F. Supp. 3d at 390.  Because defendant has not shown that litigating this case in Massachusetts rather than New Jersey would cause it any unreasonable burden, this factor weighs against transfer.

### b.      Convenience of Witnesses and Location of Documents

The convenience of expected witnesses is "probably the most important factor, and the factor most frequently mentioned."  *Princess House, Inc. v. Lindsey*, 136 F.R.D. 16, 18 (D. Mass. 1991) (citations omitted).[8]  Courts must look at "the number of potential witnesses located in

---

[8] Neither side contends that the location of documents impacts this motion.

both the transferor and the transferee district, the nature and quality of their testimony, and whether the witnesses can be compelled to testify." *Id.*

In analyzing this factor, the court is ordinarily concerned with the location of witnesses who are not employees of the parties. *See* 15 WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3851 (4th ed. 2025) ("[T]he convenience of witnesses who are employees of a party is entitled to less weight because that party can obtain their presence at trial.") (citing cases); *Sigros*, 129 F. Supp. 2d at 71 ("If, however, a court order or the persuasion of an employer who is a party to the action can secure the appearance of witnesses regardless of the location of forum, that factor diminishes in importance.").

As required, both sides have identified expected witnesses, including non-party witnesses, who cannot be compelled to testify in the transferor or transferee district. LendingClub lists six former employees as expected non-party witnesses, all of whom reside in Massachusetts or Maine and could not be compelled to testify in New Jersey. (Pl.'s Opp. Def.'s Mot. Transfer Venue 8-10, Dkt. No. 36).[9]  In response, Valley lists four former employees as key expected witnesses who are outside of this Court's subpoena power. (Def.'s Reply Memo. L. Supp. Mot. Transfer Venue ("Def.'s Reply") 3-4, Dkt. No. 43).[10]

---

[9] Specifically, LendingClub lists LendingClub lists Brendan O'Leary, Brad Wolcott, Brian Cirone, Marc Francesconi, Adam Dubeshter, and Matt Cerutti. (Pl.'s Opp. Def.'s Mot. Transfer Venue 8-10, Dkt. No. 36).

[10] One former employee is Ann Wilhelm, a resident of New York, who worked at Valley until March 2025 as a loan officer and the commercial banking team leader. (Def.'s Reply 3).  According to the complaint, Wilhelm was substantially involved in Valley's communications with the borrower and LendingClub concerning Merrill Lynch's potential lease extension, late loan payments, and overall servicing of the loan. (*See* Am. Compl. ¶¶ 29, 30, 32, 34, 40, 52, 60, 62).

In addition to Wilhelm, Valley identifies Joseph Nerich, Jo Ann Barton, and Pamela Werner as former employees expected to testify. (Def.'s Reply 4).  All three reside in either New York or New Jersey. (*Id.*).  While working at Valley, they were involved in servicing the loan, communicating with the borrower and Prager, and pitching the Participation Agreement to LendingClub. (*Id.*).

While the number of expected witnesses each side lists is an important consideration, the "nature and quality of their testimony" is also a key factor to weigh. *Princess House, Inc.*, 136 F.R.D. at 18. Defendant's former employees will likely be able to testify as to what they knew concerning the underlying loan and when they knew it, which are key elements of plaintiff's claims. That said, plaintiff's non-party witnesses will also provide important testimony as to what plaintiff was told and when. All of plaintiff's non-party witnesses were centrally involved in the initial solicitation and negotiation of the Participation Agreement, as well as ongoing communications with Valley concerning the Agreement and servicing of the underlying loan. (Pl.'s Opp. Def.'s Mot. Transfer Venue 8-10).

It is also unclear whether defendant's key non-party witnesses would in fact be unwilling or unable to testify in Massachusetts.[11] But even if that were true, transfer would not normally be warranted on that basis alone. *See Art Tech. Grp., Inc. v. Puritan's Pride, Inc.*, 716 F. Supp. 2d 93, 106 (D. Mass. 2010) ("[T]he convenience of two non-party witnesses is insufficient to outweigh the deference due to plaintiff's choice of forum, especially where, as here, a number of witnesses are based in Massachusetts."). Furthermore, there is no apparent reason why their testimony could not be given by video deposition, a commonplace occurrence in modern civil trials.

In any event, for those reasons, this factor is essentially neutral.

---

[11] Although defendant correctly asserts that these witnesses would be beyond this court's subpoena power, it provides no evidence as to whether they would be willing to testify voluntarily, a key consideration in the transfer analysis. *Compare Longtin v. Organon U.S.A., Inc.*, 2017 WL 9885438, at *4 (D. Mass. May 16, 2017) (denying transfer to New Jersey in part because defendant failed to present evidence that non-party witnesses "are unwilling or unable to appear at trial in Massachusetts"), *and E.E.O.C. v. Texas Roadhouse, Inc.*, 2012 WL 5894910, at *2 (D. Mass. Nov. 9, 2012) (denying transfer when defendant did not make "any showing that . . . its witnesses are unwilling or unable to appear"), *with Princess House, Inc.*, 136 F.R.D. at 19-20 (allowing transfer when defendant submitted declaration that critical out-of-state non-party witnesses would be unwilling to testify voluntarily in this district.). It is also, of course, likely that the witnesses could testify by video deposition.

### c.    Connection between the Forum and the Issues

Massachusetts has a substantial connection to this action.  Defendant directed its initial solicitation for the Participation Agreement to Radius—now merged into plaintiff—in Massachusetts.  (Am. Compl. ¶¶ 12, 14).  The Participation Agreement was signed and at least partially negotiated in Massachusetts.  (*Id*. ¶ 8).  In addition, defendant made hundreds of communications concerning the Participation Agreement and its servicing of the loan, including the alleged omissions and misrepresentations giving rise to this action, to plaintiff's employees in Massachusetts.  (*Id*. ¶¶ 16, 19).

New Jersey, of course, also has a connection to this action.  Defendant's main office is in New Jersey, and some of the communications that defendant made to plaintiff concerning the Participation Agreement came from defendant's employees based in New Jersey.  In addition, the borrower is a New Jersey entity, controlled by Prager, a New Jersey resident, and the property underlying the loan is located in New Jersey.  However, as plaintiff notes, the majority of the alleged misconduct giving rise to this action was undertaken by defendant's employees in its New York office, not its New Jersey office.  Seery and Wilhelm, defendant's main points of contact with plaintiff until 2024, both worked in defendant's New York office, not in New Jersey.

For those reasons, this factor weighs against transfer.

### d.    The Law to be Applied

The parties agree that New York law applies to the interpretation of the Participation Agreement and to the fraud claims.  (*See* Memo. L. Supp. Def.'s Mot. to Dismiss 12 n.5, 18-19; Pl.'s Opp. Mot. to Dismiss 17-18, 25-26, Dkt. No. 47).  Federal courts can apply the common law of another state and typically do not consider the application of another state's law to be an important factor in a § 1404 transfer analysis.  *See Blue Cross & Blue Shield of Mass.*, 633 F. Supp. 3d at 391.  The complaint also asserts a claim under Mass. Gen. Laws ch. 93A, which this

21

court has more experience applying than would a federal court in New Jersey. Therefore, this factor weighs against transfer.

### e.    Public Interests at Stake

Public-interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62 n.6 (2013) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

Massachusetts has "a substantive social policy of protecting its citizens and providing a forum for redress of grievances." *Nowak v. Tak How Inv., Ltd.,* 899 F. Supp. 25, 34 (D. Mass. 1995). As explained above, Massachusetts has a strong connection to this controversy and has a substantive local interest in protecting its businesses from alleged harm caused in the state.

Defendant contends that judicial economy weighs in favor of transfer because there are three pending actions against it in the District of New Jersey, all before the same judge, that "concern the same form of Participation Agreement, the same contested contractual provision, and the same borrower (the Pragers)." (Def.'s Memo. L. Supp. Mot. Transfer Venue 6, Dkt. No. 28).[12] Valley cites *Ridenti v. Google LLC* in support of that contention. 530 F. Supp. 3d 164, 167-68 (D. Mass. 2021). In *Ridenti*, the court transferred a second-filed class action to the court of a first-filed class action because both actions involved "nearly identical proposed classes of Massachusetts residents[,]" "the cases raise[d] substantially similar issues[,]" and because a plaintiff's forum choice is given less weight when the plaintiff asserts "claims in a second-filed putative class action." *Id*.

---

[12] Valley did not identify any court congestion issues that would warrant transfer, and it is not obvious that New Jersey would be more "at home" with the application of New York law than this court.

*Ridenti* is clearly distinguishable from this case.  Plaintiff has not brought a class action, and it is not related in any way to the plaintiffs in the other actions pending against defendant in New Jersey.  Furthermore, even if the cases involve interpreting the same contract, plaintiff's claims are based on particular allegations of defendant's actions and representations towards plaintiff over the course of their contractual relationship.  How defendant acted toward, or what it said to, other parties has no bearing on the success or failure of this plaintiff's claims.

Finally, defendant contends that transfer is appropriate because it eliminates the need to decide whether this Court has personal jurisdiction over the case.  Some courts have held that transfer is appropriate " 'if the transfer would obviate a substantial question of personal jurisdiction' and avoid jurisdictional discovery." *Convergence Techs. (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 643 (E.D. Va. 2010) (quoting *In re Pfizer, Inc.,* 364 F. App'x 620, 622 (Fed. Cir. 2010)); *see also Get In Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F. Supp. 3d 173, 206 (D. Mass. 2016).  Here, however, the personal jurisdiction question may be (and has been) resolved without the need for jurisdictional discovery.  Thus, this factor weighs against transfer.

### 3.    Conclusion

On balance, defendant has not proved that "the interests of justice and convenience weigh heavily in favor of transfer." *See Systemation*, 992 F. Supp. at 63.  The relative convenience of parties weighs against transfer.  The convenience of witnesses and the location of documents is essentially neutral.  Massachusetts has a substantial connection to this action, at least as substantial as that of New Jersey, and the applicable law and public interests at stake do not favor transfer.

In sum, venue is proper in Massachusetts and transfer to the District of New Jersey is not appropriate.  For those reasons, the motion to transfer venue will be denied.

IV.     **Rule 12(b)(6) Motion to Dismiss**

Finally, defendant has moved to dismiss the amended complaint on the basis that it fails to state a claim upon which relief can be granted.  For the reasons that follow, the motion will be granted in part and denied in part.

A.     **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must "take the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in the plaintiff's favor."  *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023) (quoting *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022)) (citation modified).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Fed. R. Civ. P. 9(b), the standard for pleading allegations of fraud is higher than the normal standard.  To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

24

B.        **Analysis**

1.        **Breach of Contract (Count 1)**

The parties agree that New York law applies to the breach-of-contract claim.  (Memo. L. Supp. Def.'s Mot. to Dismiss 12 n.5; Pl.'s Opp. Mot. to Dismiss 17-18 (citing New York law)).[13] Under New York law, a plaintiff bringing a claim for breach of contract must show "[1] the existence of a contract, [2] the plaintiff's performance under the contract, [3] the defendant's breach of that contract, and [4] resulting damages." *Holman v. St. John's Episcopal Hosp.*, 241 A.D.3d 1295, 1297 (N.Y. App. Div. 2025).

The complaint alleges two types of contractual breaches by defendant.  First, it alleges that defendant breached section 9 of the Participation Agreement, which lays out a procedure under which, if the borrower defaults and several other conditions precedent are met, defendant would be obligated to repurchase plaintiff's share of the loan.  (Pl's. Opp. Mot. to Dismiss 17-19).  Second, it alleges that defendant breached section 8(b) of the Agreement, which requires defendant to "exercise the same care . . . in servicing, administering, and enforcing the Loan and all collateral as [defendant] customarily exercises in similar transactions entered into solely for its own account, with no participants." (*Id.* at 20-23).  Defendant contends that it did not breach any provision of the Participation Agreement and that, even if it did, the complaint does not allege damages resulting from that breach.  (Memo. L. Supp. Def.'s Mot. to Dismiss 12-16).

---

[13] The Participation Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of New York with respect to the conflicts of laws rules." (Participation Agreement ¶ 19, Dkt. No. 42-1).  It is unclear whether the proper interpretation of that language is that New York law should apply to the interpretation of the contract, or whether New York conflict-of-laws rules should apply to determine which state's substantive law to apply.  However, the parties' apparent agreement that the substantive law of New York should apply is sufficient to resolve the question. *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 23 (1st Cir. 2011) ("When the parties agree on the substantive law that should govern, we may hold the parties to their plausible choice of law, whether or not that choice is correct." (internal quotation marks omitted)).

25

a.      **Section 9**

Section 9 of the Participation Agreement, which is titled "Notice of Event of Default, Foreclosure, etc.; Exercise of Remedies," sets out a procedure to be followed in the event of the borrower's default.  First, upon acquiring knowledge either of a payment default or any other default "which [defendant] determines, in its sole reasonable discretion, will have any material, adverse effect on the Loan or the Collateral," defendant is required to "notify [plaintiff] thereof within a reasonable time period, based on the nature and severity of the Default but in no event more than ten (10) days," and to "provide [plaintiff] with prior written notice of any actions proposed to be taken by [defendant] with respect thereto," subject to an exception for exigencies. (Participation Agreement § 9(a)).  Then, after plaintiff receives that notice, it "may, if it disagrees with [defendant's] proposed actions, file an objection in writing . . . within one business day after the receipt of said notice."  (*Id.* § 9(b)).  After that, if defendant fails to respond or rejects plaintiff's proposal following further discussions, plaintiff "may demand that [defendant] repurchase" its share of the loan.  (*Id.* § 9(c)).

The complaint alleges at least one failure to give notice of a payment default within the time period required under the Agreement.  According to the complaint, plaintiff was not informed until August 21, 2024, that the borrower had failed to make the payment due on August 1, 2024.  (Am. Compl. ¶ 76).  Under the terms of the underlying mortgage, an "Event of Default" occurs if the borrower fails to make a payment "within five (5) days after such payment is due." (Mortgage Agreement § 8.1, Dkt. No. 42-5).  And because defendant serviced the underlying loan, it is a reasonable inference that it learned of this monetary default as soon as it occurred. Thus, as of August 6, 2024, defendant was obligated to inform plaintiff of this default "within a reasonable time period . . . in no event more than ten (10) days."  (Participation Agreement § 9(a)).  According to the complaint, plaintiff was not informed until August 21, 2024, fifteen days

later.  (Am. Compl. ¶ 76).  Therefore, the complaint plausibly alleges a breach of section 9(a) of the Participation Agreement.

Furthermore, the complaint alleges that defendant's breach of section 9(a) resulted in damages.  "[B]y . . . failing to provide notice of the Borrower's defaults as they arose," the complaint alleges, defendant "prevented [plaintiff] from initiating the Repurchase Procedure [of § 9(c),] thereby frustrating and denying [plaintiff] its opportunity and right to cause [defendant] to repurchase" plaintiff's share of the loan.  (Am. Compl. ¶ 127).  In other words, it alleges that had defendant promptly informed plaintiff of this default as required under the Participation Agreement, it could have caused defendant to repurchase its share of the loan at par value.  (*See* Participation Agreement § 9(c)).  Under the circumstances, that is sufficient to allege damages resulting from defendant's breach of section 9.

### b.      Section 8(b)

The complaint further alleges that defendant breached section 8(b) of the Participation Agreement by failing to "service, administer, and enforce the Loan in accordance with [defendant's] usual practices in the ordinary course of its business and to exercise the same care . . . in servicing, administering, and enforcing the Loan and all collateral as [defendant] customarily exercises in similar transactions entered into solely for its own account." (Participation Agreement § 8(b)).  The complaint alleges, among other things, that if defendant had exercised due care, it would have taken some action before June 26, 2024, that would have prevented the borrower from transferring more than $600,000 from an account with defendant to an account with another bank from which the money was apparently dissipated.  (Am. Compl. ¶¶ 66, 71-72).

Defendant contends that even if the complaint alleges a breach of defendant's loan-servicing obligations, it fails to allege harm resulting from the breach.  (Def.'s Reply 7, Dkt. No.

27

55).  But it is a reasonable inference that if defendant had exercised due care, the transferred funds would not have been dissipated and that plaintiff therefore would have been able to recover a proportionate share of that total.  That is sufficient to allege a plausible claim of damages.

In summary, because the complaint plausibly alleges breaches of both sections 9 and 8(b) of the Participation Agreement, and that damages resulted from those breaches, the motion to dismiss will be denied as to Count 1.

### 2.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count 2)

Under New York law, the "parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)).  "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* (quoting *Harris*, 310 F.3d at 80) (citation modified).  Therefore, "[a] claim for violation of the covenant survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract."  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022); *see also Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26, 35 (S.D.N.Y. 2021) ("[A] claim for breach of the implied covenant of good faith and fair dealing is not duplicative when the claim depends on facts in addition to those that might support a breach of contract claim." (citation modified)).

Here, plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing generally arise from the same facts and seek the same relief.  For example,

the section of the complaint concerning the implied-covenant claim alleges that defendant "failed to timely . . . disclose Borrower's many material defaults . . . and thus failed to comply with [section 9] and breached the Participation Agreement including [section 8(b)] and disclosure obligations." (Am. Compl. ¶ 122). Those claims are largely duplicative of the breach-of-contract claim. (*See id.* ¶ 113).

There is, however, at least one set of factual allegations that is arguably unique to the implied-covenant claim: the allegation that defendant's "refusal to place the Borrower in default was due to [defendant's] desire to avoid cross-defaulting the other loans with the affiliates of the Borrower and Prager." (*Id.* ¶ 124). It is true that the complaint asserts that this constituted a "violat[ion] [of] Lender's Standard of Care"—that is, it violated section 8(b) of the Participation Agreement. Therefore, although the allegation is located within the section of the complaint concerning the implied-covenant claim, it is arguably part of the breach-of-contract claim. Nonetheless, that is not how the complaint is framed, and under the circumstances presented here, it is reasonable to construe the complaint to allege a breach of the implied covenant (arising out of defendant's desire to avoid triggering cross-defaults) that is materially distinct from the claim that it failed to exercise due care and therefore breached the contract.

Accordingly, the implied-covenant claim is based on at least some allegations different from those underlying the breach-of-contract claim, and the relief sought is not entirely tied to any damages from defendant's breach of contract. Therefore, the implied-covenant claim is not necessarily duplicative of the breach-of-contract claim, and the motion to dismiss will therefore be denied as to Count 2.

### 3.    Fraud Claims (Counts 3-5)

The complaint further asserts claims for constructive fraud (Count 3), fraudulent concealment (Count 4), and affirmative fraud (Count 5).[14]  To survive a motion to dismiss those claims, the complaint must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

The elements required to prove each of the fraud claims largely overlap, with some distinctions.  Under New York law, a claim of common-law fraud requires "[1] a material misrepresentation of a fact, [2] knowledge of its falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff[,] and [5] damages."  *City of Long Beach v. Agostisi*, 200 N.Y.S.3d 390, 394 (N.Y. App. Div. 2023).  A claim for constructive fraud requires the plaintiff to prove that "(1) a representation was made, (2) the representation dealt with a material fact, (3) the representation was false, (4) the representation was made with the intent to make the other party rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties are in a fiduciary or confidential relationship."  *Del Vecchio v. Nassau County*, 499 N.Y.S.2d 765, 768 (N.Y. App. Div. 1986).  Thus, the elements are the same as for actual fraud, "except that the element of scienter"—that is, the defendant's knowledge of the representation's falsity—"is replaced by a fiduciary or confidential relationship between the parties."  *Wilson v. Dantas*, 746 F.3d 530, 536 n.2 (2d Cir. 2014); *see Brown v.*

---

[14] In their respective filings, both parties assume that New York law applies to the fraud claims as well as the contract and implied-covenant claims.  (*See* Memo. L. Supp. Def.'s Mot. to Dismiss 18, Dkt. No. 41; Pl.'s Opp. Mot. to Dismiss 25-26, Dkt. No. 47).  While the Participation Agreement provides that its terms "shall be governed by and construed in accordance with" New York law, it does not provide that New York law should apply to any dispute arising out of the contractual relationship created by the Participation Agreement. (Participation Agreement ¶ 19).  But because the parties are in agreement that New York law should apply, the Court will follow suit.  *See In re Newport Plaza Assocs., L.P.*, 985 F.2d 640, 644 (1st Cir. 1993) ("When opposing parties agree to the source of the substantive law that controls their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry."); *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 23 (1st Cir. 2011) ("When the parties agree on the substantive law that should govern, we may hold the parties to their plausible choice of law, whether or not that choice is correct." (internal quotation marks omitted)).

30

*Lockwood*, 432 N.Y.S.2d 186, 193 (N.Y. App. Div. 1980).  A claim for fraudulent concealment requires the plaintiff to prove the defendant's "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages."  *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90-91 (2d Cir. 2005).  One of the ways in which a duty to disclose can arise is where there is a "fiduciary or confidential relationship between the parties."  *Banque Arabe et Internationale d'Invesstiseement v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995).

### a.    Constructive Fraud and Affirmative Fraud (Counts 3 and 5)

The claims for constructive fraud and affirmative fraud fail because the complaint fails to allege that defendant made a material statement that was literally false or misleading.  It is axiomatic that a statement must be false, or at least misleading, to serve as the basis for a claim of fraud.  *See Lovett v. Allstate Ins. Co.*, 446 N.Y.S.2d 65, 67 (N.Y. App. Div. 1982) ("In proving an allegation of fraud, an essential element is that the representation must have been false when it was made."); *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018) ("It is fundamental in the law of fraud that in order for a representation to furnish the basis for relief, it must be false." (quoting 60A N.Y. Jur. 2d Fraud & Deceit § 120 (2018))).  And to meet the pleading standard of Rule 9(b), a complaint must allege why a given statement was false, not merely that it was.  *See Berliner v. Lotus Dev. Corp.*, 783 F. Supp. 708, 711 (D. Mass. 1992) ("A conclusory allegation, without supporting facts, is insufficient to support a claim of fraud.").

The only statement the complaint cites as the basis for the constructive-fraud claim is Morisco's statement on a November 5, 2024, call that "VNB was only just then able to confirm

31

common ownership between AREP and the Borrower." (Am. Compl. ¶¶ 85, 141).[15]  The

complaint also alleges that Morisco told plaintiff on a July 29, 2024 call that defendant "was

only [then] becoming aware of the possibility of common ownership between [AREP] . . . and

the Borrower," and that Morisco told plaintiff on an August 21, 2024 call that defendant "still

had not confirmed common ownership between the Borrower and AREP." (*Id.* ¶¶ 73, 76).  But

the complaint does not provide sufficient plausible factual allegations that any of those

statements were false when they were made.  The only such allegation is that in February 2024

another lender, Bethpage Federal Credit Union, had filed a complaint alleging that such common

ownership existed.  (*Id.* ¶¶ 89-90; *see id.*, Ex. H).  But even assuming that allegation was made

by Bethpage in that complaint, and that the allegation was true, it would not be sufficient to

demonstrate that the statement that defendant was not "able to confirm" common ownership until

November 2024 was false.  The complaint therefore fails to plausibly allege facts showing that

the statement was in fact false or misleading.

The claim for affirmative fraud adds an allegation that defendant made "[f]alse

statements to [plaintiff] as to [defendant's] reasons for not placing the Borrower in default and

not placing the loan in non-accrual status." (Am. Compl. ¶ 171(e)).  But the complaint does not

include allegations of any particular statement that meets that description.  To be sure, the

complaint sets forth plaintiff's theory that defendant failed to place the borrower in default in

order to avoid cross-defaulting other loans that defendant had with the borrower.  (*See, e.g.*, Am.

Compl. ¶ 55).  But it does not include allegations of any particular statement that defendant made

---

[15] Paragraph 85 of the complaint asserts that this statement was made during a phone call; paragraph 141 appears to allege that it was made by e-mail.  That discrepancy is ultimately immaterial.

about its reason for not placing the borrower in default. Without such detail, such a generalized allegation cannot serve as the basis for plaintiff's fraud claim. *See Berliner*, 783 F. Supp. at 711.

Therefore, the motion to dismiss will be granted as to the claims for constructive fraud (Count 3) and affirmative fraud (Count 5).

### b. Fraudulent Concealment (Count 4)

Proof of a fraudulent-concealment claim does not require a plaintiff to identify a particular statement that was false or misleading. As noted, to state a claim for fraudulent concealment under New York law, a plaintiff must allege a defendant's "(1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." *TVT Records*, 412 F.3d at 90-91. In business negotiations, a duty to disclose material information can arise under several circumstances. One is where there is a "need to complete or clarify one party's partial or ambiguous statement." *Banque Arabe*, 57 F.3d at 155. Another is where there is a "fiduciary or confidential relationship between the parties." *Id.* Yet another is where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Id.* And, finally, a duty to disclose arises "where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair." *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33, 37 (N.Y. App. Div. 1996).

A fiduciary or confidential relationship is one that would "warrant[] the trusting party to repose his or her confidence in the defendant and therefore to relax the care and vigilance he or she would ordinarily exercise in the circumstances." *Agostisi*, 200 N.Y.S.3d at 394 (citation modified). "Even in an arms-length business relationship, a plaintiff can establish a claim for constructive fraud where the defendant 'misled the plaintiff by false representations concerning the subject of his superior knowledge or expertise.'" *Cornelia Fifth Ave., LLC v. Canizales*, 2016

33

WL 5390894, at *9 (S.D.N.Y. Sep. 26, 2016) (quoting *Lockwood*, 432 N.Y.S.2d at 195).    Where a contract expressly disclaims the existence of any fiduciary relationship, courts are divided as to whether a claim for constructive fraud or fraudulent concealment can nonetheless rest on the existence of a confidential, rather than fiduciary, relationship.  *Compare Avnet, Inc. v. Deloitte Consulting LLP*, 133 N.Y.S.3d 553, 556 (N.Y. App. Div. 2020) ("The constructive fraud claim was correctly dismissed because the [contract] expressly disclaims any fiduciary relationship between the parties, each of which is a sophisticated corporate entity."), *with LBBW Lux. S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014) (noting that while parties' contract "explicitly disclaimed a fiduciary relationship, it did not take the additional step of disclaiming other forms of relationships that may induce reliance," and that confidential relationship could still exist as a result).  But there appears to be more agreement that "[a]bsent an effective disclaimer, the existence of a confidential relationship is ultimately a 'question of fact, dependent upon the circumstances in each case.'"  *LBBW Lux. S.A.*, 10 F. Supp. 3d at 525 (quoting *In re Brand*, 173 N.Y.S. 169, 172-73 (N.Y. App. Div. 1918)).

Under the circumstances, the complaint appears to include sufficient allegations of a confidential relationship between the parties to create a duty of disclosure.  It is true that the Participation Agreement explicitly disclaims the existence of a *fiduciary* relationship between plaintiff and defendant.  (Participation Agreement § 15 ("[N]either the execution of this Agreement nor the management and administration of the Loan and the related documents, nor any other right, duty or obligation under or pursuant to this Agreement is intended to be or create any express, implied or constructive trust or fiduciary relationship between [defendant] and [plaintiff].").  But, as noted, that does not necessarily mean that no *confidential* relationship existed between the parties.  The complaint alleges, for example, that "[k]nowledge of the other

34

loans with the affiliates of the Borrower and [Prager] and the defaults of these loans was uniquely in the possession of [defendant] and [plaintiff] had no means through the exercise of ordinary intelligence and reasonable diligence to learn of any of this except through timely disclosure by [defendant]." (Am. Compl. ¶ 140). Because the "existence of a confidential relationship is ultimately a question of fact," such an allegation is sufficient, at this stage, to plausibly assert that defendant had a duty to disclose certain information to plaintiff because of this confidential relationship. *See LBBW Lux. S.A.*, 10 F. Supp. 3d at 525 (citation modified).

The complaint further alleges that defendant breached that duty to disclose by failing to inform plaintiff of the full scope of its dealings with the borrower and with Prager. The complaint asserts that defendant "had entered into five other very substantial loans with affiliates of the Borrower and Prager," and that it "did not disclose the existence of all of these other loans or the full extent of their financial dealings with affiliates of the Borrower and Prager to" plaintiff. (Am. Compl. ¶ 53).[16]

The complaint also alleges that defendant acted with the intent to defraud plaintiff and that plaintiff relied on the nondisclosure. As noted, it alleges that defendant's "refusal to place the Borrower in default was due to [defendant's] desire to avoid cross-defaulting the other loans with the affiliates of the Borrower and Prager." (Am. Compl. ¶ 55). Reading the complaint as a whole, it is fair to infer that defendant failed to disclose information about the other loans for the

---

[16] Plaintiff's theory of detrimental reliance is essentially that, if it had been informed of the full extent of the relationship between defendant and Prager, it would have been better able to exercise its right under the contract to force defendant to repurchase its share of the loan. But the "repurchase procedure" under section 9 of the Participation Agreement includes several conditions precedent that must be triggered by defendant before plaintiff could demand repurchase. It is certainly possible that any such damages were the result of defendant's breach of contract—for example, not servicing the loan correctly or not placing the loan in default when it should have—rather than a separate fraudulent omission. For present purposes, however, the allegations are sufficient to state a claim.

same reason—that is, to avoid revealing the extent of the business relationship between defendant and Prager and thereby perhaps having to cross-default the other loans as a result. And the complaint adequately alleges that plaintiff relied on these nondisclosures to its detriment. It asserts that if plaintiff had been informed of the extent of the relationship between defendant and Prager, it would have been better able to force defendant to repurchase its share of the loan. (Am. Compl. ¶ 165). "A concealment of material facts that induces nonaction, where action would otherwise have been taken, is as culpable as an affirmative misrepresentation." 60A N.Y. Jur. Fraud & Deceit § 147 (2025).

Defendant contends that plaintiff cannot show reliance on any statements or omissions because a disclaimer in the contract recites that "[plaintiff] has independently and without reliance upon [defendant] or any other person, and based upon such documents and information as [plaintiff] has deemed appropriate, made its own decision to enter into this Agreement." (Participation Agreement ¶ 6(d)). But New York courts have held that "a buyer's disclaimer of reliance cannot preclude a claim of justifiable reliance on the seller's . . . omissions unless (1) the disclaimer is made sufficiently specific to the particular type of fact . . . undisclosed; and (2) the alleged . . . omissions did not concern facts peculiarly within the seller's knowledge." *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 28 (N.Y. App. Div. 2014). Here, the claim for fraudulent concealment is based on facts alleged to have been "peculiarly within [defendant's] knowledge"— defendant's pre-existing relationship with Prager.

And although the Agreement permits defendant to engage in additional business with the borrower, it does not explicitly disclaim plaintiff's reliance on the existence, or lack thereof, of any preexisting business relationship between defendant and Prager or the borrower. (Participation Agreement § 10(a)).

36

Finally, the complaint alleges that plaintiff suffered damages as a result of defendant's concealment.  Under New York law, "a fraud claim that arises from the same facts as an accompanying contract claim, seeks identical damages[,] and does not allege a breach of any duty collateral to or independent of the parties' agreements is subject to dismissal as redundant of the contract claim." *Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 186 (N.Y. App. Div. 2017) (citation modified).  To be sure, parts of the complaint seem to seek the same damages for the fraudulent-concealment claim as for the breach-of-contract claim.  The complaint alleges, for example, that as a result of defendant's omissions concerning its relationship with Prager, plaintiff "was frustrated from and precluded from forcing [defendant] to repurchase [plaintiff's] Participant's Share under Section 9 of the Participation Agreement"—the same harm that the complaint alleges resulted from defendant's breach of contract.  (Am. Compl. ¶ 165).  But the complaint does include an allegation, even if somewhat sparse, of damages beyond those arising from the breach of contract:  "[B]y reason of the negative financial consequences of reporting losses and less favorable financial results arising out of having to write-off the value of [plaintiff's] Participant's Share, [plaintiff] has suffered further and additional damages arising out of [defendant's] fraudulent concealment in an amount to be determined at trial."  (*Id.* ¶ 169).  Therefore, the damages plaintiff seeks for the fraudulent-concealment claim are not wholly duplicative of those it seeks for the breach-of-contract claim, and the fraudulent-concealment claim will therefore not be dismissed on that basis.

For those reasons, the claim for fraudulent concealment meets the pleading standard of Fed. R. Civ. P. 9(b), and the motion to dismiss will be denied as to Count 4.

### 4.    <u>Violation of Mass. Gen Laws ch. 93A (Count 6)</u>

Finally, defendant has moved to dismiss the Chapter 93A claim on the grounds that the complaint does not adequately allege that defendant's misconduct occurred primarily and

substantially in Massachusetts, or that defendant engaged in unfair or deceptive business practices.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws, ch. 93A § 2. Section 11 of Chapter 93A, "the business-to-business provision[] of the consumer protection statute," *Kunelius v. Town of Stow*, 588 F.3d 1, 15 (1st Cir. 2009), provides that no action may be brought under the statute unless the complained-of conduct occurred "primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11.

The critical inquiry to determine whether the statute's geographic predicate is met is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003). That requires a holistic, fact-based analysis, considering factors such as "where the defendant commits the unfair or deceptive act or practice," "where the plaintiff receives or acts on the wrongful conduct," and "where the plaintiff sustained losses caused by the wrongful conduct." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 118 (D. Mass. 2024) (quoting *Kuwaiti*, 438 Mass. at 472 n.13). The question of whether the test has been met is a question of law. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009). And despite the fact-intensive nature of the analysis, courts will grant a motion to dismiss when the complaint fails to plead facts demonstrating that the center of the alleged misconduct was within Massachusetts. *See, e.g.*, *CrunchTime! Info. Sys., Inc. v. Frischs Restaurants, Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025). "[W]hile the fact that a plaintiff suffered an injury in Massachusetts does not suffice by itself to satisfy the center-of-gravity test, the place of injury is a relevant factor in the analysis," *Cynosure, LLC v.*

38

*Reveal Lasers LLC*, 793 F. Supp. 3d 315, 355 (D. Mass. 2025) (internal citations removed), and if the complaint alleges that "the plaintiff is located in Massachusetts and that the injury occurred in Massachusetts," it typically satisfies the geographic predicate at the motion-to-dismiss stage, *Jofran Sales, Inc. v. Watkins & Shepard Trucking, Inc.*, 216 F. Supp. 3d 206, 216 (D. Mass. 2016). Furthermore, in cases based upon misrepresentations, courts have suggested that the state in which the misrepresentations are "received and acted upon" and in which any loss occurs is the center of gravity for the claim. *See Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535, 546 (1st Cir. 2009); *see also Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 638 (1985).

The allegations of the complaint satisfy the geographic requirement at this stage. The complaint alleges that plaintiff's relevant subsidiary was located in Massachusetts and that the injury to plaintiff was felt in Massachusetts. (Am. Compl. ¶¶ 1, 176, 180). The specific allegations of the complaint further reveal that the center of gravity of the unfair trade practices was within the Commonwealth. The core of plaintiff's Chapter 93A claim is that defendant made certain representations that were misleading, or failed to make certain disclosures that it should have, to plaintiff's employees in Massachusetts, and thereby caused plaintiff to suffer a harm in Massachusetts. At this stage, that is sufficient. *See Sonoran Scanners*, 585 F.3d at 546.

Additionally, a Chapter 93A claim must allege "some form of deceptive or unfair conduct." *States Res. Corp. v. The Architectural Team, Inc.*, 433 F.3d 73, 84 (1st Cir. 2005). To determine whether a business practice is unfair under Chapter 93A, courts must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or

39

other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (internal quotation marks and citation omitted). To be actionable under section 11, the conduct in question must constitute an "extreme or egregious" business wrong or "commercial extortion," or rise to some similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce." *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (citing *Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto,* 73 Mass. App. Ct. 141, 169 (2008)). Courts have recognized that, at least in the context of contract negotiations, "'stringing along' a counterparty to induce detrimental reliance can constitute a Chapter 93A violation." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 70 (1st Cir. 2009).

Here, the complaint sufficiently states a claim under Chapter 93A. It alleges that defendant was "stringing [plaintiff] along" throughout 2023 and 2024 in order to avoid having to put the underlying loan in default and therefore cross-default the other loans that defendant had entered into with Prager or entities controlled by Prager. (*See* Am. Compl. ¶¶ 29-90). While distinguishable from the facts of *Massachusetts Eye & Ear Infirmary* because the "stringing along" in that case occurred during contract negotiations that did not result in a contract between the parties, the core allegations of the complaint are nonetheless analogous.

To be sure, as defendant notes, a "simple breach of contract" is not actionable under Chapter 93A. *See Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013). But the complaint alleges more than a simple breach. It alleges that defendant engaged in a long-running scheme to frustrate plaintiff's ability to demand repurchase or otherwise recover more of its interest in the loan, in part through conduct that arguably complied with the letter of the contract

40

but was designed to unfairly leverage the agreement to plaintiff's detriment.  (Am. Compl. ¶¶ 55, 178-79).  Under the circumstances, and particularly considering that Chapter 93A "is a statute of broad impact," *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 15 (1st Cir. 2021) (internal quotation removed), the Court finds that the complaint adequately alleges unfair or deceptive business practices so as to state a claim under Chapter 93A.  Therefore, the motion to dismiss will be denied as to Count 6.

## V.      Conclusion

For the foregoing reasons, the motion to transfer venue is DENIED; the motion to dismiss for lack of personal jurisdiction is DENIED; and the motion to dismiss for failure to state a claim is GRANTED as to Counts 3 and 5 of the amended complaint and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: March 31, 2026                                United States District Judge

41